**REVISED NOVEMBER 13, 2002**

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

m 00-51119

_____

ENCORE VIDEOS, INC.,

Plaintiff-Appellant,

VERSUS

CITY OF SAN ANTONIO,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Western District of Texas

_____

October 29, 2002

Before SMITH and EMILIO M. GARZA,
    Circuit Judges, and CUMMINGS,[*]
    District Judge.

---

[*] District Judge of the Northern District of
Texas, sitting by designation.

JERRY E. SMITH, Circuit Judge:

I.

Appellant Encore Videos, Inc. ("Encore Videos"), operates a sexually oriented retail video store in San Antonio, Texas. In April

1995, the city council enacted Ordinance #82135, which forbids sexually oriented businesses from locating within 1000 feet of residential areas. Encore Videos' store is within 1000 feet of a residential area, although separated by the Loop 410 highway. Encore Videos provides only sales for off-premises viewing; customers cannot view the videos at the store.

In September 1997, Encore Videos sued, challenging the ordinance on First Amendment grounds. In response, the city amended and reenacted the ordinance to impose procedural safeguards required by *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990). The new law, Ordinance #87443, took effect in March 1998. Encore Videos filed an amended complaint challenging the new ordinance on federal and Texas state constitutional grounds.

The district court granted the city's motion for summary judgment and denied Encore Videos'. *Encore Video* [sic]*, Inc. v. City of San Antonio*, No. Civ. A. SA-97-CA1139FB, 2000 WL 33348240 (W.D. Tex. Oct. 2, 2000). Encore Videos appeals, arguing that the ordinance offends by the First Amendment and the state Constitution. We reverse and remand.

II.

A.

Before addressing the merits of the First Amendment claim, we must determine whether the ordinance should be analyzed as a prior restraintSSas advocated by Encore VideosSSor as a time, place, and manner regulation. As a general rule, "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority," is a presumptively

unconstitutional "prior restraint." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150-51 (1969). Zoning regulations restricting the location of adult entertainment businesses are considered time, place, and manner regulations, however, if they do not ban them throughout the whole of a jurisdiction and are "designed to combat the undesirable secondary effects of such businesses" rather than to restrict the content of their speech *per se*.[1] Relevant harmful secondary effects of adult businesses include crime, reduction of economic activity, and lowered property values. *Lakeland Lounge*, 973 F.2d at 1257.

There is no evidence of improper censorial motives on the part of the city council. Where "nothing in the record . . . suggests impermissible motives on the part" of the enacting legislature, a local government seeking to use the secondary effects justification need show only that "(1) the drafters of the ordinance did rely upon studies of secondary effects," and (2) a "majority" of the city council members received "some information about the secondary effects." *Lakeland Lounge*, 973 F.2d at 1259.

In an opinion rejecting a First Amendment challenge to Ordinance #82135, the predecessor to Ordinance #87443, we held that the city "relied on studies provided by the City Council relating to secondary effects." *NATCO, Inc. v. City of San Antonio*, No. 98-50645, slip op. at 6 (5th Cir. June 2, 1999) (unpublished). In this circuit, unpublished opinions issued on or after January 1, 1996,

---

[1] *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 49 (1986); *see also Lakeland Lounge, Inc. v. City of Jackson*, 973 F.2d 1255, 1257-58 (5th Cir. 1992) (same).

2

generally are not binding precedent, although parties may cite them, and they have "persuasive value." 5TH CIR. R. 47.5.4. *NATCO*'s factual findings on the exact point at issue surely carry "persuasive" weight. *Id.* They also have been endorsed by the district court *a quo*. In any event, there is no reason to go against the factual findings of *NATCO* on this point, and we follow them here.

Even a content-neutral regulation may be considered a prior restraint if it gives government officials "unbridled discretion" to restrict protected speech.[2] But Ordinance #87443 does not fall into this category, because the Director of Building Inspections may deny a sexually oriented business's permit application only if the applicant seeks to utilize a location within 1000 feet of a residential neighborhood, another sexually oriented business, or several other precisely specified types of properties. San Antonio Ordinance #87443 § 2(a)-(f).

B.

1.

To pass constitutional muster, a time, place and manner regulation must be "content-neutral, . . . narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Frisby v. Schultz*, 487 U.S. 474, 481 (1988) (internal citations omitted). In *City of Renton*, 475 U.S. at 47, the Court created some confusion as to the appropriate test by stating that "time, place, and manner regulations are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication." This phrasing seems to eliminate the requirement of narrow tailoring.

Nonetheless, later Supreme Court decisions on time, place, and manner regulations have continued to apply the narrow tailoring standard.[3] A leading post-*City of Renton* secondary effects decision of this court also applied it. *See SDJ, Inc. v. City of Houston*, 837 F.2d 1268, 1273 (5th Cir. 1988).[4] We therefore conclude that the requirement of narrow-tailoring remains in force.

Encore Videos argues that the San Antonio ordinance fails to meet the first three of the four requirements of the time, place, and manner test. We address each in turn.

---

[2] *See, e.g., Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757 (1992) (invalidating regulation that "plac[es] unbridled discretion in the hands of a government official or agency"); *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975) (same).

[3] *See, e.g.*, *Ward v. Rock Against Racism*, 491 U.S. 781, 796 (1989); *Frisby*, 487 U.S. at 481; *Cf. Int'l Eateries of Am., Inc. v. Broward County, Fla.*, 941 F.2d 1157, 1162 (11th Cir. 1991) (advancing several reasons why narrow tailoring requirement survives *City of Renton*).

[4] The more recent *Lakeland Lounge* decision, which also dealt with First Amendment challenges to a "secondary effects" ordinance, did not mention the narrow-tailoring requirement, but neither did it explicitly repudiate it. *See Lakeland Lounge*, 973 F.2d at 1257 (holding that zoning ordinance restricting the location of adult businesses must be content-neutral, "'designed to serve a substantial governmental interest' and may 'not unreasonably limit alternative avenues of communication'") (quoting *City of Renton*, 475 U.S. at 47). Because *Lakeland Lounge* did not state that the standards it imposed were the *only* ones required, it is not directly inconsistent with SDJ or with post-*City of Renton* Supreme Court opinions applying the time, place, and manner test.

2.

The first requirement is content neutrality. "'The principal inquiry in determining content neutrality, in speech cases generally and in time, place, and manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys.'" *Hill* v. *Colorado*, 530 U.S. 703, 719 (2000) (quoting *Ward*, 491 U.S. at 791). Although Encore Videos claims that Ordinance #87443 is "content-based," it provides no evidence to support that assertion.

The inquiry here is similar to that applied to the question of secondary effects motivation, described in part II.A, *infra*. It is not certain, however, whether the two tests require the same degree of proof of improper motive before a regulation fails them. Even so, an ordinance for which the record discloses *zero* proof of improper motive surely passes both tests.

3.

We next consider the requirement that the ordinance serve a substantial government interest. "A city's 'interest in attempting to preserve the quality of urban life is one that must be accorded high respect.'" *City of Renton*, 475 U.S. at 50 (quoting *Young v. Am. Mini-Theatres*, 427 U.S. 50, 71 (1976) (plurality opinion)). "Local governments . . . can restrict adult businesses in order to control the bad 'secondary effects'SSsuch as crime, deterioration of their retail trade, and a decrease in property valuesSSthat the establishments bring." *Lakeland Lounge*, 973 F.2d at 1257. There is, therefore, no doubt that the secondary effects that the San Antonio ordinance seeks to remedy are important enough to be considered a substantial government interest under the time, place, and manner test.

We have interpreted the substantial government interest standard as requiring not only a showing of the *importance* of the interest, but also a demonstration that the challenged statute, at least to some degree, is *effective* in serving that interest.[5] This approach arguably conflicts with *City of Renton*, which mandates only that a statute be "*designed* to serve a substantial government interest" and does not require evidence of effectiveness. *City of Renton*, 475 U.S. at 47 (emphasis added). *City of Renton* does require proof of the *existence* of the secondary effects that the challenged ordinance seeks to eliminate but does not consider the question of proof of effectiveness in combating them. *Id.* at 50-52. This court's caselaw also may be in tension with other Supreme Court time, place, and manner cases that require evidence of effectiveness and necessity only as a part of the narrow-tailoring prong of the time, place, and manner test. *See, e.g., Frisby*, 487 U.S. at 484-87. Nonetheless, *J&B Entertainment* is binding on us unless overruled en banc.

Fortunately, this question has little practical

---

[5] *See J&B Entertainment, Inc. v. City of Jackson*, 152 F.3d 362, 371 (5th Cir. 1998) (holding that "*Renton* teaches us that [to pass the substantial interest test] the government must produce *some* evidence of adverse secondary effects" that the ordinance works to eliminate); *see also Flanigan's Enter., Inc. v. Fulton County, Ga.*, 242 F.3d 976, 985 (11th Cir. 2001) (holding that "to meet their burden" under the substantial interest prong, "the Defendants must have some factual basis for the claim" that adult entertainment activities restricted by the challenged statute "result . . . in undesirable community conditions") (internal citations omitted), *cert. denied*, 122 S. Ct. 2356 (2002).

4

significance for the present case. Evidence of effectiveness too weak to survive scrutiny under *J&B Entertainment*'s version of the substantial interest standardSSwhich requires only that the "government must present sufficient evidence to demonstrate 'a link between the regulation and the asserted governmental interest' under a 'reasonable belief' standard"SSsurely will also fail to meet the requirements of the much more stringent narrow tailoring prong. *See J&B Entertainment*, 152 F.3d at 372.[6] We therefore choose not to address any apparent inconsistency in the caselaw and, instead, will consider the relevance of the ordinance's effectiveness under the narrow tailoring prong.[7]

### 4.

The ordinance's constitutionality under the time, place, and manner test therefore turns on the narrow tailoring prong. It fails to meet this test and therefore is unconstitutional.

### a.
### i.

The recent decision in *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 122 S. Ct. 1728 (2002) sheds important new light on the application of the narrow tailoring prong to secondary effects cases. We begin our analysis with that decision, issued after the district court had entered judgment in the instant case.

*Alameda Books* is difficult to apply, because no single opinion garnered the votes of a majority of Justices. The Court split 4-1-4, with Justice Kennedy writing a concurring opinion. The Court upheld, against a summary judgment motion, an ordinance that prohibited "'the establishment of more than one adult entertainment business in the same building, structure or portion thereof.'" *Id.* at 1731 (quoting Los Angeles Municipal Code § 12.70 (1983)). The city had adopted the ordinance to combat the alleged harmful secondary effects of adult businesses.

Justice O'Connor's plurality opinion, joined by three other Justices, concluded that the ordinance should survive summary judgment despite an absence of evidence specifically demonstrating that forbidding multiple adult businesses to operate under one roof reduces secondary effects. The plurality reasoned that the city should not be required "to demonstrate, not merely by appeal to common sense, but also with empirical data, that its ordinance will successfully lower crime." *Alameda Books*, 535 U.S. at ___, 122 S. Ct. at 1736. Instead, "a municipality considering an innovative solution" to secondary effects problems need not have specific data "that could demonstrate the efficacy of its proposal because the solution would, by definition, not have been implemented previously." 122 S. Ct. at 1736.

Justice Kennedy's concurring opinion adopts a very different view. He holds that, to survive summary judgment, "a city must advance some basis to show that its regulation has the purpose and effect of suppressing secondary effects, *while leaving the quantity and accessibility of speech substantially intact.*" *Id.* at 1742 (Kennedy, J., concurring) (emphasis added). Justice Kennedy took special care to emphasize that, although "[i]t is

---

[6] The *J&B Entertainment* court, 152 F.3d at 372, claimed that the requirement of "a link between the regulation and the asserted governmental interest" is a direct quotation from *City of Renton*. It is not.

[7] *See infra* part II.B.4.

no trick to reduce secondary effects by reducing speech or its audience . . . a city may not attack secondary effects indirectly by attacking speech." *Id.* Nonetheless, he concluded that the ordinance could survive summary judgment because the city plausibly could claim that its "ordinance will cause two businesses to split rather than one to close, that *the quantity of speech will be substantially undiminished*, and that total secondary effects will be significantly reduced." *Id.* (emphasis added).[8]

Finally, the dissenting opinion of Justice Souter, joined by two other Justices in full and by Justice Breyer with respect to part II, asserted that the Court should have affirmed the Ninth Circuit's decision striking down the ordinance. *Id.* at 1747 (Souter, J., dissenting). In a portion of his dissent joined by Justice Breyer and the other dissenters, Justice Souter contended that the ordinance should be overturned because there was no evidence to support the city's claim that requiring adult businesses operating under the same roof to separate actually reduces secondary effects. *Id.* at 1748-49 (Souter, J., dissenting).

In *Alameda Books*, the city had relied on a 1977 study concluding that concentrations of adult businesses generally increase secondary effects such as crime. *Id.* Justice Souter, however, concluded that this study was insufficient, because it did not provide "any evidence to support even the simple proposition that an otherwise lawfully located adult bookstore combined with video booths will produce any criminal effects" or demonstrate that such effects could be reduced by dispersing the two establishments. *Id.* at 1748-49.

Justice Souter rejected Justice Kennedy's claim that the city's weak evidence could survive summary judgment because the burden the ordinance imposes on speech might turn out to be minimal. *Id.* at 1749 n.8. Such an approach, he concluded, "turns intermediate scrutiny on its head," because it focuses on the degree to which the challenged ordinance burdens speech rather than on the "asserted governmental interest." *Id.* Justice Souter still would require that the burden on speech be "no greater than necessary to further that interest" and would require stronger proof of the ordinance's efficacy in reducing secondary effects than would be required by either Justice Kennedy or the plurality. *Id.*

ii.

"When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977) (quotations omitted). Where, however, there is an area of common agreement between "[a]t least five justices," that conclusion is valid as law even if some of the Justices endorsing the proposition in question were in dissent. *Snead v. Redland Aggregates Ltd.*, 998 F.2d 1325, 1333 n.10 (5th Cir. 1993).[9]

---

[8] *See also Alameda Books*, 122 S. Ct. at 1743 (concluding that ordinance survived summary judgment only because "[d]ispersing two adult businesses under one roof is reasonably likely to cause a substantial reduction in secondary effects while reducing speech very little").

[9] *Snead* was based on an interpretation of *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985), a 3-2-4 decision similar to
(continued...)

In *Alameda Books*, there is an area of agreement between Justice Kennedy and the four dissenters that is sufficient to determine the outcome of the present case. Justice Souter, joined by three other Justices with respect to this part of his dissent, concluded that the burden on speech imposed by a secondary effects ordinance must be proven to be "no greater than necessary to further th[e city's] interest" in combating secondary effects. *Alameda Books*, 122 S. Ct. at 1749 n.8 (Souter, J., dissenting). In his separate opinion, Justice Kennedy goes even further: He would require the city to provide evidence showing that "the quantity of speech will be substantially undiminished, and that total secondary effects will be significantly reduced" by the challenged ordinance. *Id.* at 1742 (Kennedy, J., concurring). Justice Kennedy and the dissenters therefore agree that the city at least must provide evidence that the burden on speech imposed by an ordinance is "no greater than necessary to further th[e city's] interest" in combating secondary effects. *Alameda Books*, 122 S. Ct. at 1749 n.8 (Souter, J., dissenting).[10]

b.

The standard derived from *Alameda Books* is supported by earlier Supreme Court time, place, and manner decisions. A time, place, and manner regulation meets the narrow tailoring standard if it "targets and eliminates no more than the exact source of the evil it seeks to remedy." *Frisby*, 487 U.S. at 485. Although government need not choose the "least intrusive means" to advance its legitimate interests, it "may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward*, 491 U.S. at 799.

This court has taken a more permissive approach than has the Supreme Court with respect to the specific instance of statutes regulating adult businesses for the purpose of combating secondary effects: "[A]n ordinance is sufficiently well tailored if it effectively promotes the government's stated interest." *SDJ*, 837 F.2d at 1276. The *SDJ* court further opined that "narrow tailoring is less important when the potential for overbreath burdens a category of speech subject to less than full First Amendment protection; sexually-oriented expression falls into such a category." *Id.*

*SDJ*, however, predates *Frisby* and *Ward*, which, without mentioning any exceptions for statutes regulating sexually-oriented expression, reassert a restrictive narrow-

_____

[9](...continued)
the 4-1-4 split in *Alameda Books*. *Snead* based its holding on a point of agreement between Justice White, one of the two Justices who wrote separate concurring opinions, and the four dissenters. *Snead*, 998 F.2d at 1325 n.10.

[10] The existence of this area of agreement between five Justices differentiates the present case from *Hopwood v. Texas*, 78 F.3d 932 (5th Cir. 1996). There, we refused to follow Justice Powell's single-Justice concurring opinion in *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978), because his "argument in *Bakke* garnered only his own vote and has never represented the view of a majority of the Court in *Bakke* or any other case."
(continued...)

_____

[10](...continued)
*Hopwood*, 78 F.3d at 944. Justice Powell's view that diversity represents a compelling state interest justifying racial preferences under the strict scrutiny test represented the view of "only one Justice." *Id.* By contrast, in *Alameda Books* there is an important area of agreement shared by five Justices.

tailoring test for all time, place, and manner regulations . *Ward*, 491 U.S. at 799; *Frisby*, 487 U.S. at 485. *Alameda Books* likewise gives no indication that the narrow-tailoring standard is any less stringent in secondary effects cases than in other time, place, and manner cases.

Indeed, Justice Kennedy's and Justice Souter's approaches in *Alameda Books* may be even more restrictive than that adopted in earlier time, place, and manner decisions. Justice Souter and the three other dissenting Justices concluded that the burden on speech must be "*no greater than necessary* to further th[e city's] interest" in combating secondary effects. *Alameda Books*, 122 S. Ct. at 1749 n.8 (Souter, J., dissenting) (emphasis added). This potentially is a more stringent requirement than that of earlier time, place, and manner cases, which give localities some leeway in regulating more speech than strictly necessary to achieve their legitimate interests, so long as the excess falls short of being "a substantial portion of the burden on speech" imposed by the challenged ordinance. *Ward*, 491 U.S. at 799. As discussed above, Justice Kennedy's view is even more restrictive than Justice Souter's.[11] Because Ordinance #87443 fails to meet the standards of the earlier *Frisby-Ward* test, we need not decide the difficult issue of whether *Alameda Books* made that standard more stringent.

Although usually only an en banc court can overrule earlier panel decisions, a panel may "disregard the precedent set by a prior panel" if there is an "intervening Supreme Court decision which changes the law." *Ruiz v. Es-*

*telle*, 666 F.2d 854, 857 n.5 (5th Cir. 1982).[12] This is precisely the situation here; intervening Supreme Court decisions have clarified the narrow tailoring standard applicable to time, place, and manner regulations in a way that closes the door on the position adopted in *SDJ*.

c.

To establish that Ordinance #87443 passes the narrow tailoring test, the city relies on three studies of the secondary effects of adult businesses, all conducted in other cities: one in Seattle in 1989, another in Austin, Texas, in 1986, and the third in Garden Grove, California, in 1991. The city is "entitled to rely on the experiences . . . of other cities . . . so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." *City of Renton*, 475 U.S. at 51-52.

The studies either entirely exclude establishments that provide only take-home videos and books (as is the case with the Seattle study)[13] or include them but do not differentiate the data collected from such businesses from evidence collected from enterprises that provide on-site adult

---

[11] *See* discussion *supra* part II.B.4.a.i.

[12] *SDJ*, 837 F.2d at 1276, relied on *United States v. Albertini*, 472 U.S. 675 (1985), for support. But although *Albertini* did hold that a time, place, and manner regulation is "permissible . . . so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation," it limited that conclusion to cases challenging "*incidental* burden[s] on speech [that are] *no greater than essential*." *Id.* at 688. *SDJ*'s reliance on *Albertini* is therefore misplaced.

[13] The Seattle study was limited to cabarets that provide live adult entertainment.

8

entertainmentSSas may have been the case with the Austin and Garden Grove studies.[14] Off-site businesses differ from on-site ones, because it is only reasonable to assume that the former are less likely to create harmful secondary effects because of the fact that consumers of pornography are not as likely to linger in the area and engage in public alcohol consumption and other undesirable activities.

The question whether the kind of studies relied on by the city constitute adequate proof is one that has divided federal circuit courts and state supreme courts. The Eighth and Tenth Circuits have endorsed the position advocated by the city here.[15] By contrast, the supreme courts of Washington and Delaware have taken positions similar to Encore Videos'.[16]

The reasoning of the Washington Supreme Court is persuasive. It points out that the ordinance at issueSSwhich placed restrictions on all video stores whose inventory consisted of ten percent or more adult materialsSSis broad enough to "include 'mainstream' video stores that have restricted adult sections." *World Wide Video*, 816 P.2d at 21. Ordinance #87443 is only slightly less extreme: It restricts the location of any bookstore or video store "where more than 20% of its inventory" consists of adult materials. San Antonio Ordinance #87443 § 1(2).

The Washington court based its decision on the fact that none of the studies cited by the city gave separate consideration to the effects of businesses that have such a small proportion of adult materials in their inventory. *World Wide Video*, 816 P.2d at 21. That court veiwed, as problematic, the inclusion of enterprises with a low percentage of pornographic material in their inventory, because many, if not most, of those enterprises offer the objectionable material only for off-site use, and there is no proof that this causes secondary effects. "[The city] has not shown that adult businesses with predominantly 'take-home' merchandise (which clearly are [*sic*] covered by the ordinance) have the same harmful secondary effects traditionally associated with adult movie theaters and peep shows . . . ." *Id.*

Given the potentially sweeping implications of the ordinances in *World Wide Video* and the instant case, we must require at least some substantial evidence of the secondary effects of establishments that sell adult products solely for off-site consumption. Otherwise, even ordinary bookstores and video stores with adult sections could be subjected to regulation that restricts their First Amendment rights without evidence that they cause "secondary effects."

---

[14] Based on the evidence in the record, it is difficult to tell whether the Austin and Garden Grove studies excluded off-site entertainment businesses entirely or lumped them in with the rest. The Austin study covered two "adult book stores" and one "adult film store" among the six adult businesses studied, but failed to indicate whether these three businesses provide any on-site entertainment. The Garden Grove study focused on a total of seven adult businesses but neglected to indicate whether any of them provided exclusively off-site entertainment.

[15] *Z.J. Gifts, L.L.C. v. City of Aurora*, 136 F.3d 683, 687 (10th Cir. 1998); *ILQ Inv., Inc. v. City of Rochester*, 25 F.3d 1413, 1418 (8th Cir. 1994).

[16] *World Wide Video, Inc. v. City of Tukwila*, 816 P.2d 18, 21-22 (Wash. 1991); *Richardson v. Wile*, 535 A.2d 1346, 1350 (Del. 1988).

Such a state of affairs surely conflicts with the requirement that government "may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward*, 491 U.S. at 799. It also conflicts with the minimal requirement accepted by Justice Kennedy and the four dissenters in *Alameda Books*: that the burden on speech imposed by a secondary effects ordinance be "no greater than necessary to further th[e city's] interest" in combating secondary effects. *Alameda Books*, 122 S. Ct. at 1749 n.8 (Souter, J., dissenting).[17]

_____

[17]As previously noted, Justice Kennedy's formulation is even more restrictive than the one adopted by the dissenters. Nonetheless, he agreed with the majority that the challenged ordinance should survive summary judgment, but only because the city plausibly could claim that its "ordinance will cause two businesses to split rather than one to close, that the quantity of speech will be substantially undiminished, and that total secondary effects will be significantly reduced." *Alameda Books*, 122 S. Ct. at 1742 (Kennedy, J., concurring).

This narrow exception does not apply to the evidence in the present case. In *Alameda Books*, the businesses could satisfy the ordinance merely by separatingSSeven if one afterwards moved next door. Here, by contrast, the requirement that adult businessesSSincluding even general bookstores with an adult sectionSSmay not locate within 1000 feet of a residential area effectively closes off large portions of the city to them, ensuring that "the quantity of speech" will not "remain substantially undiminished." *Id.* Even if this part of Justice Kennedy's opinion did favor the city here, we would not be required to follow it, because it is not supported by any of the other eight Justices, even in part. The stand-alone opinion of "only one justice" is not binding precedent. *Hopwood*, 78 (continued...)

Under *Alameda Books*, therefore, the city, to meet its burden, must provide at least some evidence of secondary effects specific to adult businesses that sell books or videos solely for off-site entertainment. Because there is no such evidence in the record, we must strike down the zoning provision of Ordinance #87443.

## III.
### A.

Under *FW/PBS*, 493 U.S. at 227-28, a content-neutral "licensing scheme" for expression that "does not present the grave 'dangers of a censorship system'" must have two "essential" procedural "safeguards": "[T]he licensor must make the decision whether to issue the license within a specified and reasonable time period during which the status quo is maintained, and there must be the possibility of prompt judicial review in the

_____

[17](...continued)
F.3d at 944.

The Tenth and Eighth Circuit decisions do not give the present ordinance much support. Both are highly conclusional in their analysis and make little effort to justify their conclusions by reference to authority. *See Z.J. Gifts,* 136 F.3d at 687 (holding, without explaining why, that the on-site/off-site distinction is immaterial, because "the record fully supports the city's regulation of sexually oriented businesses providing both on- and off-site viewing of sexually explicit materials"); *ILQ Inv.*, 25 F.3d at 1418 (rejecting the distinction because "that simply is not the law," without giving more than a cursory explanation why).

The Eighth Circuit does attempt to buttress its position by citing *Ward* and *Albertini*. *Id.* The *ILQ Investments* court, however, misstates these decisions' elaboration of the narrow-tailoring test. *See* discussion of *Ward*, *supra* part II.B.3.b.

10

event that the license is erroneously denied."[18] Like the present case, *FW/PBS* involved a zoning and licensing ordinance for adult businesses. *Id.* at 220-21. Encore Videos claims that Ordinance #87443 violates both of the procedural requirements imposed by *FW/PBS*. Even though we decide in favor of Encore Videos on its challenge to the ordinance's zoning requirement, we must address the *FW/PBS* procedural issue, because Encore Videos will remain subject to Ordinance #87443's procedural requirements even if one of the substantive elements is held to be unconstitutional.[19]

B.

We reject Encore Videos' argument that Ordinance #87443 violates *FW/PBS*'s requirement that "the licensor must make the decision whether to issue the license within a specified and reasonable time." *FW/PBS*, 493 U.S. at 228. The ordinance requires the Director of Building Inspections to "issue or deny a certificate of occupancy to a sexually oriented business not more than thirty (30) business days subsequent to the date of the application's submission of an application therefor." San Antonio Ordinance #87443 § 2(f)(4). A license may not be approved until a series of inspections have been performed, and there is no time limit for the completion of the inspections.[20]

At first glance, the city's licensing system seems analogous to that which the Supreme Court found unconstitutional in *FW/PBS*. The ordinance challenged in that case also had a thirty-day deadline, combined with a system of required inspections for which there was no separate time limit. The ordinance was struck down because it "provide[d] no means by which an applicant may ensure that the business is inspected within the 30 day time period." *FW/PBS*, 493 U.S. at 227.

The city and the district court here distinguish *FW/PBS*, however, on the ground that the permit system in question here assigns

---

[18] Although the portion of Justice O'Connor's opinion for the Court laying out these standards won the support of only three Justices, three others endorsed a concurring opinion by Justice Brennan that argued for even stronger procedural protections. *FW/PBS*, 493 U.S. at 238-42 (Brennan, J., concurring). "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. at 193. Thus, Justice O'Connor's opinion must be considered binding precedent.

[19] The relevance of *FW/PBS* is not affected by *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 322 (2002), which held that the procedural requirements of *Freedman v. Maryland*, 380 U.S. 51 (1965), elaborated in *FW/PBS*, do not apply to "a licensing scheme . . . [that] is not subject-matter censorship but content-neutral time, place, and manner regulation of the use of a public forum." The present case does not concern "regulation of the use of a public forum." *Id.* Like *FW/PBS* and unlike *Thomas*SSwhich addressed a demonstration permit system for public parksSSthis case addresses a licensing scheme for adult businesses. *Thom-*
(continued...)

[19](...continued)
*as* did not overrule *FW/PBS* or even hint that its scope has been narrowed.

[20] *See* San Antonio Uniform Building Code § 109.3 (requiring that a "certificate of occupancy" be issued only "[a]fter the building official inspects the building or structure and finds no violation of the provisions of this code or other laws which are enforced by the code enforcement agency").

11

the task of inspection to the same official who is required to issue or deny a license within thirty days.[21] The Director of Building Inspections therefore is able to control the inspection process and ensure that it is completed within the thirty-day period. By contrast, the system invalidated in *FW/PBS* assigned the task of inspection to three separate agencies, none of which was under the control of the chief of police, the official tasked with enforcing the thirty-day deadline for issuing a permit. *Id.*

This is a matter of first impression and is a close call.[22] Nonetheless, based on the record before us, we conclude that Ordinance #87443 does not violate the promptness requirement of *FW/PBS*. It is certainly plausible to argue that the director's deadline for issuing a permit

---

[21] *Encore Video*, 2000 WL 33348240, at *5-*6; *see also City News & Novelty, Inc. v. City of Waukesha*, 604 N.W.2d 870, 880 (Wis. Ct. App. 1999) (endorsing a similar argument), *cert. granted*, 530 U.S. 1242 (2000), *cert. dism'd*, 531 U.S. 278 (2001).

[22] This court did once briefly consider the question. In *Crystal Cinema v. City of Lubbock*, No. 97-10597 (5th Cir. July 16, 1998) (unpublished), we held that the city's permit system for adult businesses was constitutional despite the fact that it failed to create a separate deadline for the completion of required inspections. The general forty-five-day deadline for consideration of applications was deemed sufficient, even though not all the agencies involved were under the authority of the City Secretary, the official responsible for issuing permits and denials within the specified time.

As an unpublished opinion, *Crystal Cinema* is not binding precedent. 5TH CIR. R. 47.5.4. Moreover, it fails even to consider the relevance of *FW/PBS* to this issue.

also constrains his discretion with respect to the scheduling of inspections. Likewise, placing the responsibility for both meeting the thirty-day deadline and carrying out the inspections in the hands of the same official makes it more likely that the deadline will be met than was the case under the system of divided responsibility reviewed in *FW/PBS*.

Because there is no evidence in the record suggesting that the Director of Building Inspections either cannot or will not be able to process adult business permit applications within the thirty-day limit, we reject Encore Videos' argument on this point. This determination, however, does not necessarily extend to other cases in which the record might reveal evidence of delays in excess of the statutory deadline.

C.

The circuits are split on the question whether *FW/PBS*'s requirement of "prompt judicial review in the event that the license is erroneously denied" requires merely prompt *access* to judicial review or a prompt judicial *decision. FW/PBS*, 493 U.S. at 228. Five circuits, including this one, have held that prompt access is sufficient. *TK's Video, Inc. v. Denton County*, 24 F.3d 705, 709 (5th Cir. 1994).[23] Three others have adopted the more stringent requirement of a prompt final decision.[24] Ordinance #87443 requires prompt

---

[23] *See Boss Capital, Inc. v. City of Casselberry*, 187 F.3d 1251, 1256 (11th Cir. 1999); *Beal v. Stern*, 184 F.3d 117, 129 (2d Cir. 1999); *Graff v. City of Chicago*, 9 F.3d 1309, 1324-25 (7th Cir. 1993) (en banc); *Jews for Jesus v. Mass. Bay Transp. Auth.*, 984 F.2d 1319, 1327 (1st Cir. 1993).

[24] *See Nightclubs, Inc. v. City of Paducah*, 202
(continued...)

access to judicial review but does not provide a time limit for a decision.[25]

The Supreme Court recently passed up an opportunity to resolve this split.[26] We therefore follow our own precedent and decide in favor of the city on this question. *See TK's Video*, 24 F.3d at 709.

The judgment is REVERSED and REMANDED for appropriate further proceedings in accordance with this opinion.[27]

---

[24](...continued) F.3d 884, 892 (6th Cir. 2000); *Baby Tam & Co. v. City of Las Vegas*, 154 F.3d 1097, 1101-02 (9th Cir. 1998); *11126 Baltimore Blvd., Inc. v. Prince George's County, Md.*, 58 F.3d 988, 998-1000 (4th Cir. 1995) (en banc).

[25] *See* San Antonio Ordinance #87443 § 2(f)(7) (providing for immediate access to judicial review but not imposing a time limit for decision).

[26] *See Thomas*, 534 U.S. at 325 (noting that the Court does not reach the issue despite the fact that it was one of the questions on which writ of certiorari had been granted)

[27] Because we strike down the locational restriction of Ordinance #87443 on First Amendment grounds, we need not address Encore Videos' argument that the ordinance violates the Texas constitution.